Thank you, your honors. Good afternoon. Carol Villegas from Labatton-Sucharo for Plaintiff Appellants. This is an appeal from the district court dismissal with prejudice of a securities class action fraud complaint. The issues before the court today are whether defendants made false or misleading statements with the requisite level of siender and whether plaintiffs have adequately pleaded loss causation. I'm going to start with the false statements, but before I do, I just want to put this case into a bit of context because the securities laws require the court to view these statements, all of the statements that were made in the context in which they were made. We've all heard of Marriott. Many of us have stayed at Marriott and we all know it's a big hotel company. In the face of competition, Marriott decided to purchase Starwood, another big hotel company. This was the largest hotel merger in history, worth $13 billion. And in purchasing Starwood, Marriott just wasn't purchasing the operations. It was purchasing data about Starwood's clientele. These were usually business travelers who like to spend money. And so this was very important for Marriott's growth. Defendant Sorensen described the merger as a bet on Starwood's loyalty program and the market recognized that Marriott purchasing Starwood's valuable customer data was a main driver of this massive merger. Now, what we've alleged in the complaint is that there were a lot of problems with the way Starwood housed this extremely important data. We have employees from both Starwood operations and Marriott operations, as well as reports that were actually commissioned by defendants and presented to the board and to the defendants that tell us that Starwood's IT systems didn't just have minor problems, but the problems were so significant and so widespread that the Starwood data was extremely vulnerable to a cyber attack. I just want to give you a couple of examples of how bad the situation really was at Starwood. They were using software that was seven years past the end of its life. This Oracle portal could no longer be patched, meaning it could no longer be attacked. Passwords were not encrypted, and Starwood was also failing to analyze log data. This is a very basic cybersecurity measure where you can see if anyone is infiltrating the system, and you would have to monitor those logs to determine if that was happening. Now, Starwood and Marriott are both credit card processors, and as such, they needed to comply with the payment card industry or PCI regulations. You're going to hear us talking a lot about PCI today. We know based on the confidential witnesses I mentioned and those same reports commissioned by the defendants and provided to defendants and the board that Starwood was not complying with a number of these very important PCI regulations. At the end of the class period, as we know, Marriott announced a massive data breach, one of the largest in history, affecting 300 million of its customers, and the stock price dropped by 5%. So, with that in mind, I want to turn to the first set of false statements, which is the risk language, which the company made in its form 10-Ks and 10-2s. Defendants said, among other things, the information security and privacy requirements imposed by governmental regulation and the requirements of the payment card industry, so the PCI requirements, are increasingly demanding. Our systems may not be able to satisfy these changing requirements. We allege these statements were false and misleading because even though Marriott is saying that they may not be able to satisfy these requirements, Starwood systems that Marriott purchased were absolutely not in compliance. What do you say Marriott should have said? Well, Your Honor, they had a choice. They either could have said nothing at all about the PCI compliance or they could have told the market that they're working to upgrade Starwood systems so that they can better protect the information that they purchased in the merger, which would have been a truthful statement. So, how would that have informed an investor? Well, I think, Your Honor, that on the Starwood system. I think, Your Honor, that it would have informed the investor that the Starwood systems may not necessarily be up to par. They could have also told the market that they were working to alleviate certain vulnerabilities in the Starwood system as well, or they could have said nothing. If you did that, it seems like to me that would be like taking an ad on the internet to every hacker in Eastern Europe and the Soviet Union and elsewhere around the world. Come on in. Well, Your Honor, it was their choice, so they didn't have to even mention PCI compliance. But when they did, then they had a duty to tell the market at that point that it wasn't that they may not be in compliance, but they actually weren't. I mean, those are the words that they chose, PCI compliance. And we have the reports that show that they actually were not compliant with PCI at that time. You say that they have a choice, and of course, they do select the language, but we're talking about the risk disclosures and that the SEC, my understanding, requires risk disclosures of these are things that are risks for our company. And the concern, I think, is that every time a company tries to comply with those risk disclosures by saying, you know, we may not be able to do this or that, if some future event happens, it could have an adverse impact, that they then have to make a corresponding statement about whether they are actually, you know, how that's going today, but that investors don't actually read risk requirements to warrant today everything's a-okay with this particular issue that we're talking about. Yeah, so I think in this particular case, you have to look at the context of the statement and why an investor would care, partly because of what I mentioned before, which is that the merger, the $13 billion merger, was really a purchase of this customer data. And I think it would have been significant to an investor to know whether that data was secure or not secure. But I guess my point is, you're saying investors read the required risk disclosures not just as the risk disclosure says we may not be able to keep up, that an investor reads that to say today we are totally in compliance. I think the issue is that we may not be able to keep up is a little bit different than we may not be compliant with PCI standards today. And in this particular case, it wasn't that there were just issues with the software or that they needed to patch little things. It was that the problem was so large and so widespread, and they had actual notice that they weren't compliant with PCI. So I think that that's what really makes the statement false, because to say that they may not be in compliance when they really weren't in compliance. Can we stick on that statement, the first one you've identified? Are you saying that that statement is false, or are you saying that it's misleading? It's misleading by omission, Your Honor. Okay, so the actual statement is not false. Well, no, actually, I think the statement could be seen as false also, because we may not be in compliance when you're actually not in compliance is not actually telling the whole truth about compliance with PCI standards. How do you correct that without saying, let me give you a laundry list of all the things that right? So 24 hours from now, we'll be hacked by everybody. Well, the alternative, Your Honor, is they could have fixed the systems, which they didn't do. We have pled in the complaint that part of the disclosures, they say we may not be able to satisfy these changing requirements, or may require significant additional investments in order to do so. So they're saying we may have to make some changes to satisfy these requirements. Right. But I guess the point is that when we talk about the reports that the board commissioned and that the board was provided, the types of problems that they were seeing in these reports starting in 2016, and going through 2018, were the same exact problems, they weren't fixing them. So, you know, they could have either fixed them, or they could have said nothing specific about PCI compliance, or they could have told the market, you know, our systems, or the start with systems that we purchased need some upgrades, and we're making them or something to that effect. So you think an investor is going to adjust what they're willing to pay for stock in Marriott, or decide to sell Marriott stock, because there's a disclosure that we may have to fix an information system somewhere? In this particular case, Your Honor, I do only because that specific data was so important to the merger, and so important to the valuation of Marriott when they merged the two companies. So for an investor to know that this information might not be secure, I think that's important, because when the information isn't secure, you have these... I told them that it might not be secure several places. Well, they didn't say it wasn't secure, which is what the truth was. So I'll ask you to respond to what strikes me as the challenge of your argument, or my bit in my head, at least. I mean, I'm willing to totally accept that the actual IT situation at Marriott was bad, bad, bad, bad, bad. And I'm totally willing to accept that a reasonable investor would be very, very interested in knowing that the IT situation at Marriott was bad, bad, bad, bad, bad. But the problem, it strikes me, is that the securities law don't have a blanket requirement that you have to tell investors every single thing they want to know, including things that are bad, bad, bad. You can't make a false or misleading statement. And I guess, could you identify for me what you think is your single strong... Because my difficulty is that a lot of their statements strike me as at least literally true. And so could you identify what you think is your strongest statement for a statement that when made was false or materially misleading? So I guess I have two things to say to that. The first is that even a literally true statement could be false and misleading by omission. For the risk language, I think it's really that they may not be in compliance with the PCI regulations when they weren't. And I would point this court to the Alphabet decision in the Ninth Circuit, which we cited to in our brief, which looked at risk language that actually wasn't even as detailed as this and found that that risk language was false and misleading in the face of defendants commissioning reports and receiving reports. And they found that the omission of any mention of the security vulnerabilities made that risk language misleading. And so I want to turn... What about this language? Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation system. It could increase in connection with the system integration. Disruptions could result in a disruption to our business or the loss of important data. That all seems to be true. And it also seems to say that if there are any defects, they could be a big problem. Why isn't that sufficient to alert an investor if that's something they're concerned about? Well, Your Honor, because there were defects. It wasn't, you know, there may be defects. If there are defects, there actually were defects at the time. And so... That kind of goes back to the previous questions I've asked you. I'm still not sure how you anticipate in this circumstance that the disclosing party is supposed to meet your view of what's adequately disclosed without broadcasting to the world, which the SEC says it doesn't have to do what the defects are. So, I think, Your Honor, it's simply that, you know, the risk disclosure didn't provide investors with the information that the company knew about the issue. And, you know, whether that's going to open them up to, you know, investigation by a government organization or cyber hacks, I mean, it's on the company to remedy these issues. Investors are purchasing the Marriott stock because they know that this $13 billion merger is going to be accretive to the company. And if there's something wrong with what they're purchasing, whether it's a good, a service, or data, investors have the right to know about that, especially when they specifically call out the PCI compliance and they're not PCI compliant. Thank you very much, counsel. You've got a minute. Good afternoon, and may it please the court. I'm Jason Mendrow. I'm here today on behalf of Marriott and the individual defendants. The fundamental problem with this case is that every one of the statements that the plaintiff challenges is 100 percent true. The complaint, the appellant's briefs amount to little more than a litany of supposed cybersecurity issues, followed by a cursory rebuttal of statements that the defendants didn't make. That is not securities fraud. In Phillips v. LCI, this court made clear that the role of courts in securities litigation is to strip the mischaracterizations and exaggerations from complaints and examine the exact statements that the defendants made in their true context. While performing that exercise here makes clear that there are no actionable statements. Most of what the court just heard, and I think is consistent with the briefs, most of what the plaintiffs challenge are Marriott's warnings. These aren't assurances, but these are warnings to the market about reasons why an investment in Marriott's stock is risky. And Judge Rushing is right. Marriott doesn't have a choice about issuing those warnings. It's required to do so by the SEC. This is item 105 of Regulation SK, which requires companies to identify the material factors that make an investment in their stock risky, and to concisely explain those factors. That comes directly from the regulation. Concisely explain. Companies are not required to disparage their cybersecurity. They're not required to detail vulnerabilities. They're required to identify material factors and explain them concisely. The statement that Marriott may not be able to satisfy changing requirements of the payment card industry is a warning. It's not an assurance. And it's true. The statement that Marriott believes that the integrity and protection of its data is critically important, it's true. You don't have to take my word for it. Page four of the appellant's brief says that Marriott's data is critically important and that Marriott acknowledges that. So it seems that we're in agreement. The warning that Marriott could be affected by cyber attacks is true. It's the reason that we're here. Marriott explains that cyber attacks could have a disruptive effect on its business. And importantly, when Marriott detected the attack that's the experience cyber attacks in the past tense. And that makes this case the complete opposite of the case that Ms. Villegas just cited from the Ninth Circuit concerning Alphabet. In the Alphabet case, the Ninth Circuit found that risk factor disclosures were misleading for one reason and one reason only. It's because the company affirmatively said that its risk had not changed since 2017 just after its management learned that it was subject to a new risk that it didn't that its risk didn't change. It changed its risk factors to reflect its understanding that there's been a new event and its risk would have been misleading if you hadn't done that. So you just represented that we didn't know. And once we found out it had happened, we changed it to say that it had happened. What if they never changed it? Do you think that would have been false or misleading? I don't judge heightens. I think that the statement that we could be where the cyber attacks could have a disruptive effect on our business would have been just as true. If the company didn't have that, we'd been subject to cyber attacks. And that is the fundamental question. As you correctly pointed out, Judge Heightens, in securities law, there is no obligation to say anything that investor might hear. That's been true since basic the 11th and the Supreme Court repeated it in Justice Ginsburg's decision. Well, it was in matrix. This court has repeated that point continuously. The obligation to speak only occurs when your affirmative statement is misleading. So the affirmative statement that we may be subject to cyber attacks that could have a disruptive effect on our business would not have been misleading even if there had been a cyber attack. What about the statement that we may not be able to keep up? Another statement that was made, right? We may not be able to keep up. I mean, I guess I would say it doesn't strike me as totally implausible to say if a person told me I may not be able to keep up with something in the future can at least arguably be read as suggesting that I am currently keeping up, right? So if I say I may not be able to keep up in the future, it's at least plausible to think that what I'm saying is I am currently keeping up now, but that may change in the future. And so, you know, when Marriott said we may not be able to keep up, how isn't that at least difficult to square with the fact that they were already failing to keep up? For two reasons, Judge Heightens. Number one, I would submit that saying that we may not be able to keep up with PCI standards is not a representation that we're currently complying with those standards. It's a warning that perhaps we're not. And several cases have made clear that a warning is not misleading just by virtue of the fact that you haven't disclosed something that's going on currently. That was basically the rationale of the Sixth Circuit decision in Bond Alley versus Yum Brands. And NRA Channel Advisors, the Eastern District of New York, or Eastern District of North Carolina, I apologize, used the same rationale, and this court had no trouble summarily affirming the decision to dismiss in that case. So that's point number one. But point number two is the rhetoric and the complaint about the defendant's knowledge about not complying with PCI standards does not match the allegations of fact. The allegations of fact do not plead specific factual allegations. The defendants were aware that the company wasn't complying with PCI standards. What the specific allegations of fact plead is that the Board of Directors was very focused on this issue. It got attention from the highest levels of management. This can be mostly found at paragraphs 314, 315, and 316 of the complaint, that the Board of Directors heard a presentation from an outside expert at PWC making recommendations about how to improve cybersecurity, including by mandating PCI compliance. That doesn't mean that there was any findings of a violation. The complaint goes on to reference a slide from that presentation that makes clear that management's intended actions presented to the Board were to improve cybersecurity at Starwood and to hire yet another consultant to conduct penetration tests. That consultant was called Protivity. The purpose of a penetration test is to identify weaknesses, find holes, and plug them. And the complaint goes on to allege specifically that Marriott did hire Protivity and that Protivity did conduct penetration tests. That's at paragraphs 28, 222, 223, and 609. And paragraph 316 of the complaint makes clear that when the Board convened again a year later at its next annual risk assessment, it heard from management about its progress. And it learned at that time that Marriott was transferring Starwood's technology standards and security standards to Marriott's. And in the what the Board actually heard is that the company was working on this issue. It did not hear that the company was in material noncompliance. And the simple assertions that Marriott did nothing or plain rhetoric that just simply were not supported by the allegations of fact. And when we pointed that out in our answering brief before this court and reply on page 12, the plaintiffs acknowledged that Marriott actually did contemplate fixes. They just go on to say that those fixes were not good enough and not fast enough. So what this basically devolves into is a dispute about whether Marriott was satisfying whatever standards the plaintiffs have for how fast these data security issues need to be addressed. But there was nothing in the complaint that would support a conclusion under the strict standards of the PSLRA that the statement that we may not be able to comply with PCI standards or other standards was in the least bit false or misleading. The other statements of plaintiff challenges are online statements. These are statements that are made to hotel guests. And these are also warnings. They're statements that caution guests that although the company will try to protect their private information, it can make no guarantees. Both of Marriott's statements in the complaint say that no transmission of data or storage on system can be 100% guaranteed to be secure. And Starwoods went back when Starwood had a separate disclosure. Starwood's statement said that guaranteed security does not exist either on or off the internet. These statements could not have convinced any reasonable person that their data was impervious to attack. They could not have convinced any reasonable person that Marriott could not be subject to cyber attack. And they are truthful. Importantly, they also have no effect on investors because these are statements that were not made to investors. They were not made in SEC filings. They were not discussed at investor conferences. They were not discussed by investment analysts. So they're not made in connection with a purchase or sale of securities. Even if the plaintiffs had alleged any false or misleading statement, and I submit to you that they did not, the complaint falls far short of the PSLRA's obligations to plead scienter. All of the scienter allegations in the complaint are pure misdirection because they don't concern misleading investors. They're simply a list of securities risks that the defendants didn't deny or mischaracterize or even discuss with investors. And the plaintiff is wrong to argue as it did on pages 31 and 32 of its brief, its opening brief, that scienter allegations don't have to be about deceiving investors. They do. That's the central focus of the scienter inquiry is whether the defendants deliberately or recklessly deceived investors. This court has decision dissenting and singer. None of the allegations concern deceiving investors. They only concern what the defendant supposedly knew about assorted cybersecurity risks, which may or may not have had anything to do with the breach that eventually occurred. It's hard to know in the absence of any false or misleading statement to point to what the guilty knowledge would be, because the only thing that is relevant as guilty knowledge under the securities laws is knowledge of misleading investors. But even if it were true, as the plaintiffs incorrectly argue, that knowledge of some kind of urgent security risk would give rise to scienter under the securities laws. The complaint doesn't satisfy that standard with particularity. What the complaint really pleads is disagreements among certain confidential witnesses, only one of whom ever spoke to any of the defendants. That defendant is no longer alleged to have made any false or misleading statement that the plaintiffs challenge on appeal and simple disagreements about business matters don't give rise to fraud. They don't give rise to scienter. That was the reasoning in KBC versus DSD XC, which we just submitted as a supplemental authority. It was also the reasoning of this court's decision and triangle capital. What the allegations show again is that the board placed a high level of importance on this issue, received regular updates, authorized the company to retain leading experts who conducted tests, who upgraded the systems, and patched Starwood while the upgrades were occurring. Those are not allegations of fraud. Those are not allegations of misconduct. Those are allegations of a responsible company doing what it could in a difficult circumstance. And the allegations at paragraph 259, I think, are also quite instructive. At 259 of the complaint, the plaintiff pleads that on November 19 of 2018, Marriott learned for the first time that personal information had been exposed by the attack. That personal information was encrypted, meaning that without an encryption code or decryption code, it couldn't be read. Nevertheless, on that very same day, Marriott began the process of notifying affected guests. That is a responsible company making hard decisions under a difficult circumstance. The plaintiff is also incorrect to argue that it gets the benefit of all the inferences in the complaint that might support a conclusion of SIENTA. The securities laws are very clear that that's not the case. In Tell Labs v. Maker, which is a Justice Ginsburg decision, the court made clear that the inferences that flow from the allegations have to be balanced. It's a comparative exercise. And the court's responsibility is to decide whether the inferences of guilt are at least as compelling as the inferences of innocence. If they're not, the inferences in favor of guilt must be rejected. In this case, the inferences of innocence are overwhelming. Marriott repeatedly disclosed that the very risks that are the subject of this case, this court has said on multiple occasions, including at Triangle Capital and KBC, that that weighs against the finding of SIENTA. The plaintiffs failed to plead that the defendants had anything to gain by concealing a breach. This case stands apart from many securities cases because there's no allegation that any of the defendants were selling their securities after they learned about this attack, but before they disclosed it. The allegations make clear that Marriott reported this situation to the FBI and cooperated with law enforcement. Criminals don't call the police. It would make no sense for Marriott to have done that if it was engaged in an exercise to defraud its investors with respect to these issues. All of these allegations point strongly in support of the inference of innocence. In sum, the district court, in a very comprehensive, detailed decision, correctly dismissed this case. Now the plaintiff seeks to rewrite Marriott's warnings as assurances that it never made and to impose vague requirements to catalog vulnerabilities that management discovers that have never been denied. There is no such requirement. Companies would have no idea how to comply with that requirement. As Judge Agee has indicated, such a requirement would actually invite attacks, subjecting companies and their customers and their employees to even affirmed. Unless the court has any questions? Thank you very much. Thank you. Ms. Villegas, you have some time left on rebuttal. Thank you, your honors. I've given some thought to the question that you asked me before about what Marriott should have said. And one of the things that strikes me is that Marriott could have taken the Starwood reservation system offline and then told the market, we're suffering vulnerabilities in our Starwood system and we're going to fix it. I mean, this was a business decision. You counsel, but if you're more comfortable with your mask off, I forgot your honor. Thank you. No problem. And so that's another thing that Marriott could have chosen to do. That's a choice they had. They chose not to probably because financially they wanted to be getting the reservations through the Starwood system. But the truth is that they knew about the vulnerabilities. They knew that this very valuable information was at risk. And instead of doing something like taking the Starwood reservation system offline to fix it, they actually kept using it even after they discovered that there had been a data breach. So for those three months before they told the market, that may have been a bad idea that might have, I guess, I'm not sure how that's a violation of the securities laws. I mean, that may have been very bad business practice. That may have been something their investors or owners or people who have entrusted their data to Starwood would have really preferred they not do. But I guess, how is that? I guess, how is failure to take it offline a violation of the securities laws? So we allege that on October 5th, Marriott made statements in its privacy statement, specifically that Starwood owned websites and servers have security measures in place to help protect your personal data. This is after they learned about the breach and that the company safeguards your information using appropriate methods, including firewalls and encryption. So they know about the breach. They know that information is very vulnerable. Someone's in the systems and yet they're making statements to the market that we use all of these methods to keep your information safe and we're keeping your information safe. So we allege that that statement was false and misleading because at the time they knew about the breach. They also knew about all the vulnerabilities that existed in the system at the time. The district court found that plaintiffs didn't allege that Marriott failed to use any of the particular security measures that it mentioned. Respectfully, we believe that the district court got this wrong. Confidential witnesses tell us that Starwood wasn't using encryption for passwords. That's paragraph 159. And even though Starwood was using firewalls, it wasn't keeping logs relating to those firewalls, which was a PCI violation. So we think that that makes that statement false and misleading. I know defense counsel mentioned that this was a statement that was made on the website and therefore it wasn't in connection with the purchase or sale of a security. But we would argue that this is definitely a statement that an investor would rely on, especially given the fact that the data breach had occurred and they didn't know about. If you look at the Equifax case, in that case there was another statement very similar to the one made here about data security. Equifax is a district court case? That's right, your honor. And in that case, there was a statement made at a university. It was a commencement speech made by the CEO about how they take pride in data security. And the court found in that case that that satisfied the in connection with requirement because it was very important to investors for a company like Equifax to know that they were actually keeping their data secure and valuable. And for those same reasons, we allege that statements about the integrity and protection of customer data being critical to the business was also false and misleading. The district court found the statements were inactionable puffery. But again, the case law asks us to look at the context in which these statements were made. And given all of these issues, that the district court even acknowledged we had adequately pled, we allege that this was also misleading because you can't say something is critical to your business. It's so important to your business. But behind the scenes, you're not protecting it and you're failing to tell the market about it. I just want to turn to Sientra for a moment because I think there's a real disagreement about the standard here. So the standard, we can show Sientra either by direct knowledge or recklessness. And recklessness is sufficiently pled where plaintiffs allege defendants knowledge of facts or access to information contradicting their public statements. We allege a number of internal reports that told that told Marriott's board and defendants time and time again that there were issues. These were recurring issues, issues with logging, issues with network segmentation, issues with PCI compliance that occurred starting on July 18th when there was a report detailing these issues. Fast forwarding six months to January 2017, PWC talks about the problems with the network segmentation and also that there were extreme vulnerabilities on February 10th, 2017. I thought your complaint also recognized that Marriott was at least trying to work on these things. Well, your honor, I believe that in when after they were notified on February 17th, there was what they called patching. But if you look at the allegations in our complaint, confidential witnesses tell us that the Oracle system could not be patched. That's where the reservation information was held. So if they were patching something, it wasn't the data that we're alleging was critically at risk here. And the allegations of the- Even if the confidential witnesses thought that it couldn't be patched, where's the allegation that that was told to any of the defendants and that they knew making the decision to patch was not going to work? Well, your honor, I think if you look at the four reports that we mentioned that were commissioned by the defendants and issued throughout the class period, the level of postmortem done at the end actually confirmed that all of the issues that were raised in these reports still existed at the time that they did the postmortem. So none of those very critical issues were fixed. One of the basic issues I mentioned in the very beginning was this issue of logging. It's something that Marriott- that a Starwood didn't do. It didn't do it throughout the whole class period, even though those are issues that were raised. And when the PFI report was the problem was so severe and so huge. We allege that these patches could absolutely not be sufficient and that it was still misleading for Marriott to not tell the market about these issues. And I see that I'm running out of time, so I just want to close with a quote from the Second Circuit Meyer v. Ginkgo Solar case. This is a court cited in the Singer decision. I know, Judge Agee, that you dissented in that decision, but I still think that this is a really great analogy to think about when you think about this case. It's that a company can't disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and then omit the fact that the system has been found to be inoperable without misleading investors. And that's exactly what we have here, which is why we would ask this the arguments from both counsel in this case. And as you probably know, in ordinary times, we come down and shake hands with counsel. That's still verboten, at least for the time being. But I hope when you return the next time, we'll be able to resume that tradition.
judges: G. Steven Agee, Allison J. Rushing, Toby J. Heytens